# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| JEAN PHILLIPS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| VS. | ) | Civil NO. 05-760-PMF |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This case was called for a bench trial on August 4, 2008, following written consents to a bench trial before the undersigned. It is a Federal Tort Claim, 28 U.S.C. §§ 1346(b), 2671-80, for money damages. Following are findings of fact and conclusions of law.[1]

## FINDINGS OF FACT

This is a sad story. Today, Jean Phillips (plaintiff) is 36 years old; divorced with two children who have their own serious mental and emotional health problems; she has a right arm which is withered, disfigured, useless, and causes her continuous and extreme pain; she is unable to maintain regular employment; and she is most likely a narcotics addict. She faces the future with no reason to be optimistic that things will improve. She attributes a great deal of her suffering to substandard medical care which resulted in a truly horrific condition known informally as "flesh-eating bacteria."

Plaintiff has a college degree with an unspecified major from Augusta College in Augusta, Georgia. Following her graduation, she met her future husband, an Air Force captain, and moved

---

[1] The reader should presume that evidence which is omitted from the findings of fact was considered to be either not relevant or was less persuasive than competing evidence.

with him to Maryland. They married on June 14, 1997. She worked for a window repair service doing accounting and a number of other functions. There was no mention of her salary. Plaintiff and her husband later transferred to Scott Air Force Base (SFAB). Once there she was treated for several health problems including: endometriosis, hypothyroidism, insomnia, headaches, anxiety, and diffuse cellulitis. The endometriosis and cellulitis caused her pain for which she was prescribed a medicine chest full of drugs, many of which were habit forming opioids containing hyrdomorphone. She received drugs such as Ativan, a benzodiazepine which is habit forming, to deal with anxiety. During the month of December 2001, she was prescribed over 450 dosages of the types above-described. More on the relevance of that later.

Plaintiff's primary care physician during 2002 was Dr. Daniel Macalpine, an Air Force officer at SAFB where plaintiff's husband was stationed. The records indicate that plaintiff began seeing Dr. Macalpine in December 2001, although the doctor recalls treating her from July of 2001 for abdominal pain and other chronic pain issues for which Vicodin and Percocet were prescribed. He also treated her for chronic insomnia for which Restoril, another addictive drug, was prescribed.

Plaintiff was taking lots of potent medicine. . . .potent, addictive medicine.

Plaintiff's arm problems started in March of 2002. As mentioned above, one of her many health problems was hypothyroidism. She was referred to Dr. Tse, an endocrinologist at St. Elizabeth's Hospital in Belleville, for testing. Her initial appointment for that purpose was March 15, 2002. Dr. Tse noticed that she had an infection evidenced by elevated temperature and skin lesions. She was referred to SAFB's emergency room for treatment of the infection, and she returned on April 15, 2002, when Dr. Tse placed an intravenous tube, also called a "PIC line"into her right arm to facilitate the repeated blood draws without several sticks. The puncture which was

2

made for this purpose was inside her right elbow.

The crucial meeting between plaintiff and Dr. Macalpine happened on April 29, 2002. According to SAFB records, plaintiff appeared with complaints of vomiting, dehydration, and "the same symptoms I always have." Her temperature was 99 degrees, slightly elevated. The records indicate that she was initially examined by Captain Robert Toner, a physician's assistant, although neither plaintiff nor Toner have any independent recollection of seeing each other that day. Toner's notes of the exam note all the above complaints along with plaintiff's request for a refill on her Ativan/Dilaudid prescription. She claimed that either she or her husband had lost the bottle containing 60 pills.

Macalpine and Toner met privately, and then Macalpine saw plaintiff. At trial, Macalpine's only recollection of plaintiff's exam that day was his growing concern for her drug seeking behavior. Indeed, the only entries he made on her chart that day reflected the lost drugs and that her husband, who was out of town, would contact him to explain what happened with the drugs she wanted replaced. Dr. Macalpine testified that persons such as plaintiff who take large quantities of habit forming narcotics may up the dosage several times to gain the desired effect. When asked whether persons other than the patient, persons like her husband, had ever been known to sell the narcotics, his response was, "It crossed our minds."

Macalpine cannot say with certainty that she did not complain of arm pain, but he does not believe that she did. The chart makes no mention at all of redness, swelling, or pain complaints from plaintiff, other than a generalized "YES" answer to the question on her chart, "ARE YOU IN PAIN," followed by "7/10" which I take to indicate that her pain was rated at 7 on a severity scale of 1 to 10. Macalpine recalls no mention by plaintiff concerning her arm or any problems with it.

3

Toner, again, has no memory of her visit and relies solely on the chart.

Plaintiff testified that the redness, heat, pain, and swelling began in her arm around April 25, and that she did, in fact, make complaints to both Macalpine and Toner. Plaintiff's former husband testified that he noticed spreading redness and swelling in her right arm during the days prior to April 29. His recollection is that her arm pain is the precise reason she went to see Macalpine on April 29.

She said that Macalpine told her go home, take Motrin, and return if things did not improve.

Things did not improve.

Plaintiff was taken to the SAFB emergency room on May 3, 2002. That chart notes "a several day history of right arm pain, redness, and foul smelling drainage. About 10 days ago, she had a PIC line placed in her right antecubital fossa so she could have frequent blood draws while having an endocrine evaluation. About a week ago, she developed redness in the antecubital fossa, which got progressively worse. She was found by a neighbor on 3 May 02 complaining of arm pain and was taken by ambulance to the Scott AFB emergency." Necrotizing fasciitis was diagnosed.

Necrotizing fasciitis, also referred to as flesh-eating bacteria, is a strep infection which attacks and decays soft tissue at the subcutaneous level. It is most often caused when bacteria enter the body though an opening in the skin. The affliction is mercifully rare, but frequently deadly. For that reason, early attempts to diagnose or rule out necrotizing fasciitis are important. Early symptoms include pain in the general area where the infection was introduced, flu-like symptoms such as nausea, fever, general malaise, and intense thirst. Shortly thereafter, swelling and discoloration develops along with putrid fluid discharge followed by toxic shock. Treatment of the more advanced cases almost always involves removal of tissue and/or amputation of affected areas.

The failure to diagnosis and treat this infection within a matter of days places the victim at a high risk of death. One of the physicians who testified in this matter placed the mortality risk as high as 50%.

Surgery was immediately performed to begin debridement and to bring the infection under control. Here, the procedure was referred to as "aggressive debridement," the removal of extensive tissue. In lay speak, that means that most of plaintiff's right arm below the elbow was taken away. She was then transferred to Barnes Hospital in St. Louis. Plaintiff was again placed under anesthesia, and the wound's severity was examined. The infection was also monitored. Her dressing required daily changes, for which she was taken into the operating room and placed under anesthesia. She had follow-up surgeries and skin grafting on May 4, May 6, May 10, May 20, and June 19. A flap was cut into her abdomen and her arm sewn into it during recovery from the surgeries. Drastic measures for a drastic situation.

What of today, and what remains of plaintiff's arm and what remains of plaintiff's life? Plaintiff is permanently and profoundly disabled. Her right arm is withered, lifeless, and useless. She lacks the muscles and tendons to sustain any meaningful activity with either her arm or her hand. What is left of her arm is discolored. . . .kind of a reddish, purplish. Like her thighs and abdomen from which donor tissue was removed, it shows the scars of several skin grafts. She carries it close to her side and has a prosthetic device which fits over what was once her forearm and wrist. It provides support and compression. And worst of all, she suffers continuous, debilitating pain which is addressed with a steady stream of medication to which she is a slave. She is embarrassed to be seen in public for herself and for her children. Her right arm and hand being useless, coupled with her constantly drug modified state, complicated by depression and anxiety

adds up to no chance for employment. She is able to drive but only short distances. She can shop only for light objects. A gallon of milk, for example, requires assistance. She needs help getting dressed. Her balance is not good, and she tires quickly. Most of her days are spent watching old movies until her children return from school. She worries that any infection may require her arm to be amputated. The cruel reality is that her life would probably improve if the arm were taken. She would probably enjoy greater use of a prosthetic arm, and she definitely would be without the pain . . . .and pain medication. As is, plaintiff suffers chronic pain syndrome for which a Duragesic patch is worn constantly. What her doctors described as "breakthrough pain" is addressed with Dilaudid, which is a trade name for hydromorphone, a morphine derivative. She has also been prescribed Neuronton, which slows brain activity in patients who have maladaptive stimulation such as chronic pain. She also takes a variety of anti-anxiety and anti-depression medications.

She will continue with her medications for the foreseeable future, and probably for life. Those medications cost $400.00 per month. Considering that plaintiff is likely to live another 44.8 years according to a standard table of mortality, those medications will cost her $215,040.00.

Her medical bills to date total $421,581.00. The government has paid through Champas and Tricare $110,748.00 toward her medical bills for which a credit would be due.

There is no reason to believe that plaintiff will work again. Considering that she was unemployed, and, due to her narcotics addiction not a candidate for any meaningful long-term employment on the date she was afflicted with the necrotizing faciitis, it does not seem fair to base any lost earnings calculation on more than minimum wage. This is so even though her education and experience, under more favorable conditions, would certainly have made her a candidate for higher earnings. Minimum wage is documented as follows: September 1, 1997–$5.15/hour; starting

6

July 24, 2007–$5.85/hour; starting July 24, 2008–$6.25/hour; and starting July 24, 2009–$7.25/hour. Plaintiff would reach age 65 on December 21, 2036. Calculated from January 21, 2003, her future lost earnings are $495,169.00. Although she last saw Dr. Macalpine on April 30, 2002, the evidence was that abdominal pain would prevent her return to work before January 21, 2003. There was no expert testimony in the case concerning reduction of future lost earnings to present cash value. Based upon the decisions of the Illinois Supreme Court in *Richardson v. Chapman*, 221 Ill.Dec. 818 (Ill. 1997), and the Seventh Circuit in *O'Shea v. Riverway Towing Co.*, 677 F.2d 1194 (7th Cir. 1982), it appears safe to go with the $495,169.00 figure. Inflation and the discount rate seem to offset one another.

The crucial factual finding will be whether Dr. Macalpine knew or should have known of plaintiff's precursor infection on April 29, 2002. He agrees that proper care would have required examination and treatment which would have led to antibiotic treatment which would likely have arrested the situation before it festered into necrotizing faciitis.

Dr. Macalpine's memory of the April 29 visit is guided by the notes, or lack thereof, in plaintiff's chart. He believes that had she complained it would have been noted.

Plaintiff, on the other hand, recalls that she had arm pain, redness, and swelling. Her former husband, who has nothing to gain from this litigation, recalled it as well. His memory is that arm swelling, redness, and pain is why she saw Dr. Macalpine on April 29. She testified without equivocation that she complained of it during the April 29 visit.

This, of course, placed the reliability and credibility of the chart's themselves into question. Plaintiff's counsel very ably exploited this opportunity and demonstrated several instances where the charts and reality went different directions. Some visits for which a billing was generated had

7

no examination notes at all.

Other chart notations involving plaintiff's arm support her position. For example, the report of Dr. Eric Benz, created shortly after her initial admission and surgery on May 3, 2002, refers to "a several day history of right arm pain." The consensus opinion of all physicians who testified is that they would have expected her to be in pain from the precursor infection. The evidence leaves no doubt at all the infection grew out of Dr. Tse's testing on April 15, 2002.

Ironically, Dr. Macalpine's failure to notice her arm or pay heed to her complaints may have been nobly motivated. He had real concern that she was becoming — or already was — an addict. Her consumption of various medications was copious, and her behavior had elevated to "drug seeking." And what is the most direct method to obtain the type of medication plaintiff sought? One complains of pain. That is what plaintiff always did. . . . ..her tried and true *modus operandi*. On April 29, she added a new arrow to her quiver. She told Dr. Macalpine that her husband had lost an entire bottle of Ativan – 60 tablets – which she wanted replaced. Dr. Macalpine may have believed he was being conned. He may have thought that her arm complaint was another device to get drugs. Didn't she always complain about something?

I believe the evidence supports the factual finding that plaintiff did, in fact, complain to Dr. Macalpine about her arm and that he overlooked it. I believe that he was preoccupied with her drug addiction and that circumstances might have elevated to the point that she was lying about losing prescriptions. I believe that his concerns were well-founded and that he should receive positive credit for that. I also believe that had he discharged his professional duty and paid attention to her arm he would have headed off the necrotizing faciitis thereby saving plaintiff much suffering.

8

## CONCLUSIONS OF LAW

In this case, plaintiff bears the burden of showing by a preponderance of the evidence that the defendant, acting through its Air Force physician, Dr. Macalpine, failed to diagnose and treat her infected right arm on April 29, 2002, and that Dr. Macalpine's failure to do so fell below the applicable standard of care. *Purtill v. Hess*, 111 Ill.2d 229 (1986). Plaintiff must also prove that the subject conduct was the proximate cause of her damages.

Dr. Macalpine has himself acknowledged, as have all other physicians so queried, that had plaintiff presented with signs of redness, swelling, and tenderness in her arm, the standard of care would have required him to examine and chart the symptoms. He neither examined her symptoms nor charted them. Obviously, he neither diagnosed nor treated the precursor infection. His treatment did not, therefore, meet the standard of care.

There is no doubt that the precursor infection in her right arm grew into necrotizing faciitis. There is likewise no difficulty finding that Dr. Macalpine's failure to recognize and treat her symptoms was the proximate cause of her injuries and damages.

The United States Circuit Court for the Seventh Judicial Circuit recently decided the case of *Arpin v. United States*, 521 F.3d 769 (7th Cir. 2008). *Arpin* was a medical malpractice death case. It was remanded for further findings concerning plaintiff's loss of society. The Seventh Circuit found that the district court judge had not satisfactorily explained how he reached the damages figure he did for loss of society. That shortcoming, according to the appellate court, violated Rule 52 of the Federal Rules of Civil Procedure.

On remand, the district court was instructed to consult awards in "similar cases" for guidance in reconstructing a loss of society award. *Id.*, at 776. It was also suggested that the district court might find useful to undertake a ratio analysis much the same as has been approved in punitive damages situations. *Id.*, at 777.

How the ratio business works will wait for another day and another case. It does not apply here. *Arpin* was a death case seeking damages for loss of society. The Seventh Circuit consistently referred to "damages for loss of consortium" in its opinion as it related to the ratio approach. Had the appellate court intended the ratio analysis to apply more broadly, it surely would have indicated that notion by referring to the damages not as for "loss of consortium," but for "non-economic damages." This plaintiff's damages arise from disability, pain and suffering, emotional distress, and the loss of enjoyment of her life. There is a great difference in those types of damages and those addressed in *Arpin*.

Loss of society (consortium) is a less subjective inquiry than the other non-economic damages. Death is inevitable, and the only way that any of us avoid dealing with the loss of those near to us is by beating them to the grave. We know from human experience that even the most painful losses of that type attenuate with time. That is not the case when considering damages which are personal to a particular plaintiff. Different lifestyles and interests are extraordinarily relevant considerations when making awards for disability, the loss of enjoyment of life, and emotional distress. A uniform approach to fixing damages of that sort ignores the fact that injuries affect different people in different ways, and it stifles the fact-finding ability of the trial court. A further concern is the certainty that higher income plaintiffs are going to receive higher awards for non-economic loss than lower income plaintiffs in cases involving exactly the same types of injuries and disabilities. Say, for example, that examining "similar cases" leads to a ratio of 8-1. That figure, 8, becomes a multiplier of economic loss. Those with a higher economic loss, higher earnings, and more expensive medical care, will yield a higher award for something which really has nothing to do with earning money. To say otherwise would imply, if not outright say, that rich people suffer more than poor people and that the aspects of a wealthy person's life which cannot be determined from a ledger, his enjoyment of life, are per se greater than a less wealthy person. Fact is, a great

number of wealthy people probably have very little enjoyment in their lives. They work all the time. No hobbies, no time spent with friends or family. The fact-finder would be deprived of recognizing those distinctions were a ratio analysis to apply when reaching awards for pain and suffering, disability, disfigurement, and the loss of enjoyment of ones life. *Arpin* did give trial courts discretion in departing upward or downward with the ratio approach, but that does not really address the core concern. Even if a ratio were raised or lowered by several points, the wealthy would benefit in ways which do not resemble fairness.

The "similar case" inquiry must also be handled with some common sense. Thankfully, necrotizing faciitis is an unusual development. There is not, and hopefully will not be, enough cases of this type to develop any meaningful body of common law. What then, are similar cases? Serious burns are equally disfiguring, but, surprisingly, the loss of use does not appear to be as great, and the lingering pain is not reported to be near what plaintiff endures. Amputations are certainly serious – debilitating, not pretty to look at, emotionally very distressing, but they lack the persistent pain experienced by plaintiff. And, with a prosthetic device, those afflicted can resume many activities, work, and recreational.

Plaintiff seems to have the worst of all of it. She cannot use her right arm for anything. She is faced with the choice of either living each day with terrible, unrelenting pain, or drifting through life as a narcotics addict. The sad irony is that her life would be much easier had the arm been lost. She would have had a chance to recover from her narcotics addiction, and a prosthetic arm would work much better for her than the one she has. Plaintiff's chances at a productive, enjoyable life are, at this point, very low.

Granted, there are more dramatic injuries out there involving multiple amputations and the like, but plaintiff's situation is about as bad as it gets when one considers the impact on her work and personal life. It is the impact that her injuries have had on her life, and not on the precise nature of

11

the injury itself, that I have focused on when looking at "similar cases." Here are representative cases:

    (1) *Dahan v. UHS of Bethesda, Inc.,* 230 Ill. Dec. 137 (1st Dist. 1998) – medical malpractice which resulted in a stroke. Plaintiff lost partial use of one of his arms, has difficulty walking, and speaking. He communicates with a speaking device and walks with a cane. Damages were challenged on appeal. The Illinois Appellate Court upheld, in part, an award of $7,500,000.00 for disability, disfigurement, pain, and suffering.

    (2) *Epping v. Commonwealth Edison Co.*, 248 Ill. Dec. 625 (1st Dist. 2000) – plaintiff sustained serious injuries to her legs which resulted in several surgeries and left her unable to walk. Doctors believed that she would one day be able to ambulate slowly, and that she also faced a possibility of losing a leg. Award of $9,000,000.00 for disability, disfigurement, pain, and suffering upheld on appeal.

    (3) *Donnellan v. First Student, Inc.*, 322 Ill. Dec. 448 (1st Dist. 2000) – plaintiff sustained head injury in vehicular accident. He had constant pain, dizziness, and cognitive and motor difficulties, although he was able to continue working from time to time. The jury's verdict which included a challenged $5,917,500.00 for disability, disfigurement, pain, and suffering was upheld on appeal.

    (4) *Barton v. Chicago & Northwestern Transportation Co.*, 258 Ill. Dec. 844 (1st Dist. 2001) – plaintiff suffered injuries when trapped and dragged by a commuter train. She lost one leg and suffered serious injuries to the other. The jury award of $28,000,000.00 for disability, disfigurement, and pain and suffering was reduced by 4.5% comparative fault. It survived a challenge to excessiveness on appeal.

I fully realize that any judge could search long enough to find cases to justify a very wide range of cases. The government submitted a number of low-ball results in support of its argument that no more than $500,000.00 should be awarded for non-economic damages. There are cases awarding higher damages out there. I want to emphasize that this plaintiff has been dealt a very, very bad situation. The cases cited above, although some may have a little more curb appeal for those seeking recitations of disastrous circumstances, are in line with what this woman faces today and will very likely deal with for the rest of her life. Her life is in the same shape as the plaintiffs in those cases.

Finally, there undoubtedly are those who would overlook the old torts maxim that tortfeasors take defendants the way they find them, *see, Brackett v. Peters*, 11 F.3d 78, 81 (7th Cir. 1983), and

argue that plaintiff should be denied substantial compensation because her life was on a downward arc when she contracted the necrotizing faciitis. She had poor health, emotional problems, and she was probably a narcotics addict. All true. She had one other thing that she does not have today. She had a chance. She could do something about those problems. Right now, her best chance at life starts with her right arm being amputated, and that may or may not happen.

Plaintiff's damages are itemized as follows:

Past medical–$421,581.00;
Future medical (medications)–$215,040.00;
Past and future lost earnings–$495,169.00;
Disability–$500,000.00 past – $2,500,000.00 future;
Disfigurement–$500,000.00;
Past Pain and Suffering and Emotional Distress–$1,500,000.00;
Future Pain and Suffering and Emotional Distress $2,500,000.00.

Total damages come to $8,631,790.00. Defendant is credited for $110,748.00. Judgment shall enter in favor of plaintiff and against defendant in the amount of $8,521,042.00.

**IT IS SO ORDERED.**

**DATED: November 25, 2008.**

> *s/Philip M. Frazier*
> **PHILIP M. FRAZIER**
> **UNITED STATES MAGISTRATE JUDGE**